## In re PITTSBURG, S. & N. R. CO.

## CENTRAL TRUST CO. OF NEW YORK v. PITTSBURG, S. & N. R. CO. et al.

### No. 21600.

District Court, W. D. Pennsylvania.

Dec. 23, 1947.

George Jerko, of Indiana, Pa., for Workmen's Compensation claimants.

Richard B. Tucker, Jr., of Pittsburgh, Pa., for Erie R. Co.

Ralph S. Davis and Dalzell, McFall, Pringle & Bredin, all of Pittsburgh, Pa., for Pennsylvania R. Co.

Paul G. Perry and Burgwin, Churchill & Ruffin, all of Pittsburgh, Pa., and John H. Cartwright, of Ridgeway, Pa., for Bruce G. Kime and Elliott & Kime.

William H. Eckert and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., and Matthew A. Crawford, of Kittanning, Pa., for Pittsburg & S. R. Co.

Lee W. Eckels, John E. Laughlin, Jr. and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for Committee for the Protection of Certificate Holders.

T. G. Gregory, B. R. Coppolo and Driscoll, Gregory & Coppolo, all of St. Marys, Pa., for F. D. Lambert, Peter McCall, Peter B. McBride and others.

Zeno Fritz, of Pittsburgh, Pa., for John Beningo.

Milton W. Lamproplos and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., for American Nat. Red Cross.

Hudson Hyatt, of Cleveland, Ohio, for Erie R. Co.

Julian Ruslander, of Pittsburgh, Pa., for Harry W. Findley.

Vincent M. Casey and Margiotti & Casey, all of Pittsburgh, Pa., for Baltimore & O. R. Co.

BARD, District Judge.

Various petitions for the allowance of fees are before the Court in the above captioned case. Petitions for that purpose were filed by Thomas C. Buchanan and Robert C. Sproul, Jr., the two Receivers and Trustees, by their counsel, Bernard Goodman and John T. Duff, Jr., and by Adrian Block and Isador Setel, attorneys in Buffalo, New York, who performed legal services in that state for the Receivers.

I. History of Case Since November, 1945.

On November 29, 1945, Thomas C. Buchanan, Esquire, and Robert C. Sproul, Jr., were appointed equity Receivers of The Pittsburg, Shawmut & Northern Railroad Company, the Shawmut Mining Company and The Kersey Mining Company, as successors to Receiver John D. Dickson, in the proceeding pending at No. 14, November Term, 1905, and thereupon duly qualified. At the time of the appointment of the Receivers, the receivership proceeding had been pending for 40 years, and there had been much public criticism of its extraordinary prolongation. At the time I appointed Mr. Buchanan and Mr. Sproul, I directed them to wind up the receivership as soon as possible, and to liquidate the property of the various defendant corporations with the utmost expedition.

The Receivers found it advisable and highly advantageous to lease the mines of the Shawmut Mining Company by lease dated February 1, 1946, to the New Shawmut Mining Company for a term of years. Upon their recommendation, the Court approved such a lease.

Soon afterwards it became obvious to the Receivers that it was impossible to operate the railroad without incurring heavy losses, and the Receivers thereupon filed their application with the Interstate Commerce Commission for leave to abandon operations over the entire railroad. Permission was granted on December 26, 1946, upon compliance with certain conditions.

After consideration of the complex problems involved, the Receivers and their counsel recommended to the Court that, insofar as the railroad properties were concerned, the only practical method of preserving the estate, or realizing its full value, was to resort to reorganization proceedings, under which it was expected that a substantial portion of the railroad might be preserved as a going concern and the unprofitable portions abandoned: If such a plan could not be effected, then the entire properties should be abandoned and sold.

Accordingly, the railroad corporation, on July 29, 1946, filed its petition in this Court at No. 21600 for the reorganization of the railroad corporation under the provisions of Section 77 of the Acts of Congress relating to Bankruptcy, 11 U.S.C.A. § 205. Thomas C. Buchanan and Robert C. Sproul, Jr., were appointed Trustees of The Pittsburg, Shawmut and Northern Railroad Company on August 12, 1946, and their appointment as Trustees was ratified by order entered October 8, 1946, by the Interstate Commerce Commission. On October 25, 1946, the Interstate Commerce Commission entered an order fixing the maximum compensation to be paid to the Trustees from the estate of the debtor or any of its subsidiary corporations during the period of their service. The provisions of this order have been examined and will be adverted to later in this opinion, and the effect, if any, of this order upon the application of the Receivers and Trustees for the allowance of compensation will be considered.

While the petitioners acted as Trustees of the railroad corporation, they continued to function as Receivers of the other properties involved in the equity receivership at No. 14, November Term, 1905.

On February 7, 1947, petitioners as Receivers in the equity proceeding and as Trustees of the railroad under Section 77 of the Acts of Congress relating to bankruptcy, filed their joint petition, setting forth that they had received from Harry W. Findley an offer, dated February 4, 1947, for the purchase of substantially all the assets of the railroad company and all the assets of the Shawmut Mining Company and of its subsidiary companies for the aggregate sum of $1,200,000. The Court directed that the petition be filed of record, both in the reorganization proceedings and in the equity proceedings, and that a hearing thereon be held on March 3, 1947. On the day of the hearing, as a result of competitive bidding, Mr. Findley increased his offer to $1,505,-000, and the properties covered by the bid were sold to him for this sum pursuant to order of Court entered March 3, 1947. The order of Court confirming the sale directed the Trustees to continue to operate the lines of the railroad south of Bolivar, New York, until March 31, 1947.

Thereafter, on July 11, 1947 after the sale to Mr. Findley had been consummated, the Trustees filed their petition for an order dismissing the reorganization proceeding. A hearing on this petition was held after due notice on July 31, 1947, on which date the Court entered an order dismissing the reorganization proceeding and directing the Trustees of the debtor to transfer possession of the debtor's assets and properties to themselves as Receivers in the equity proceedings. The order further directed that the claims filed in the reorganization proceeding be transferred to the receivership proceeding with the same force and effect as though filed therein. The Interstate Commerce Commission by its letter dated July 23, 1947, had consented to the dismissal of the reorganization proceeding in view of the fact that the debtor railroad was no longer engaged in interstate commerce, having abandoned the remainder of its operations as of March 31, 1947.

The Receivers and Trustees filed their First and Final Accounts on August 7, 1947, together with petitions for the allowance of compensation, and an order was entered on the same day setting August 28, 1947, as the date for a hearing to pass upon the respective accounts and upon the applications for allowances.

## II. Compensation of the Petitioners as Trustees.

The order of the Interstate Commerce Commission dated October 25, 1946, reads as follows: "It is ordered, That maximum compensation of the said Thomas C. Buchanan at the rate of seven hundred and fifty dollars ($750) a month for his services as such trustee, and maximum compensation of the said Robert C. Sproul, Jr., at the rate of seven hundred and fifty dollars ($750) a month for his services as such trustee, to be paid from the estate of the debtor, beginning as of the effective date of their appointments, be, and they are hereby, approved as reasonable; provided, that while each of them serves as trustee the only compensation he shall receive from the estate of the debtor or any of its subsidiary corporations shall be that allowed him by the court as such trustee within the maximum limits so fixed by this Commission."

Messrs. Buchanan and Sproul acted as Trustees of the debtor railroad from October 8, 1946, when their appointment as Trustees was ratified by the Commission, until July 31, 1947, when the reorganization petition was dismissed by order of Court.

In their capacity as Trustees of the debtor railroad during the period October 8, 1946, until July 31, 1947, I think that the petitioners are well entitled to be paid at the rate of $750 a month. I will accordingly allow to Messrs. Buchanan and Sproul the sum of $7330 each for their services as Trustees.

## III. Compensation of the Petitioners as Receivers.

Prior to October 8, 1946, and subsequent to July 31, 1947, as well as during the period of the trusteeship, petitioners Buchanan and Sproul acted as Receivers in equity of the Shawmut Mining Company and of The Kersey Mining Company, and operated as Receivers all other properties of the defendant companies in the equity proceeding with the exception of the properties of the debtor railroad.

That portion of the Interstate Commerce Commission order entered October 25, 1946, which reads "provided, that while each of them serves as Trustee the only compensation he shall receive from the estate of the debtor *or any of its subsidiary corporations* shall be that allowed him by the Court as such trustee within the maximum limits so fixed by this Commission" does not purport to fix the compensation which the Court may award Messrs. Buchanan and Sproul for serving as equity receivers of the Shawmut Mining Company, or of any other non-railroad company which was a defendant in the original equity proceedings, either prior to, during, or subsequent to the period during which the petitioners were acting as Trustees of the railroad property. The Shawmut Mining Company was not a subsidiary of The Pittsburg, Shawmut and Northern Railroad Company, debtor in reorganization, because, by the provisions of Section 77, sub. a, only a railroad corporation could be classified as a subsidiary of a debtor railroad being reorganized under said section.

When Section 77 was originally enacted in 1933 by Public Law 420, 72nd Congress, March 3, 1933, 47 Stat. 1474, c. 204, a portion of 77, sub. a read as follows: *"Any corporation,* the majority of the capital stock of which having power to vote for the election of directors is owned, either directly or indirectly through an intervening medium, by any railroad corporation filing a petition as a debtor under this section, or substantially all of whose properties are operated by such a debtor under lease or operating agreement may file, with the court in which such other debtor had filed such a petition, and in the proceeding upon such petition under this section, a petition stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization * * *." (Italics supplied).

The wording of the above sentence left a slight doubt whether the words "any corporation" meant that a non-railroad corporation which was a subsidiary of a railroad debtor in reorganization could, as a subsidiary, be reorganized in the same proceeding as that involving the parent corporation. This doubt was purely theoretical because in practice the courts without exception construed the words "any

corporation" to mean any railroad corporation, and there is no case which adjudicated that a non-railroad corporation could be reorganized in the same Section 77 proceeding in which its parent, a railroad corporation, was being reorganized.

However, to remove any possible doubt concerning the meaning of the sentence, quoted above from the Act of 1933, when Section 77 was completely revised and enlarged by Public Law 381, 74th Congress, August 27, 1935, 49 Stat. 911, c. 774, the above sentence was amended to read: § 77, sub. a. *"Any railroad corporation the majority of the capital stock of which having power to vote for the election of directors is owned, either directly or indirectly through an intervening medium, by any railroad corporation filing a petition as a debtor may file, with the court in which such other debtor has filed such a petition, and in the same proceeding, a petition, a copy of which shall also be filed at the same time with the Commission, stating that it is insolvent and unable to meet its debts as they mature, and that it desires to effect a reorganization in connection with, or as a part of the plan of reorganization of such other debtor; and upon the filing of such petition, the judge shall enter an order either approving it as properly filed under this section \* \* \* or dismissing it if not so satisfied \* \* \*."* (Italics supplied.)

█ As a result of the above amendment, it is clear that a subsidiary of a debtor railroad in reorganization must itself be a railroad corporation in order to fall within the jurisdiction of a Federal Court wherein a proceeding involving the reorganization of a debtor railroad has been filed. It follows therefore that a non-railroad corporation, the majority of whose stock is owned or controlled by a debtor railroad in reorganization, is not such a subsidiary of the parent railroad in reorganization as to qualify for reorganization in the same debtor proceeding in which the parent railroad is being reorganized.

█ The Interstate Commerce Commission, under Section 77, has no jurisdiction over non-railroad corporations. Hence, in view of the amended subsection a of

Section 77, quoted above, the Interstate Commerce Commission order of October 25, 1946 restricting the compensation to be paid the Trustees "from the estate of the debtor or any of its subsidiary corporations", obviously means "from the estate of the debtor or any of its subsidiary railroad corporations", and has nothing to do with any award which this Court may make to Messrs. Buchanan and Sproul for their services as equity Receivers of the Shawmut Mining Company and The Kersey Mining Company from November 29, 1945 until the present time.

As far as the railroad property is concerned, it will be observed that the jurisdiction of the Interstate Commerce Commission to fix the maximum compensation of Trustees who are operating railroads extends only to Trustees of railroads and their subsidiary railroad companies which are being reorganized under Section 77 of the Bankruptcy Act.

█ It is therefore apparent that the Interstate Commerce Commission order of October 25, 1946 likewise has nothing to do with the authority of this Court to grant adequate compensation to Messrs. Buchanan and Sproul for their services as equity Receivers of the railroad property both prior to their appointment as Trustees in the Section 77 proceeding, and subsequent to the termination of their services as Trustees.

It is obvious to one who considers the history of the instant proceeding, from November 29, 1945, when petitioners were appointed as successor equity Receivers, until the present time, that the Section 77 proceeding from October 8, 1946 until July 31, 1947, was only an interlude in the course of the main equity proceeding, and that its chief purpose was to enable the Trustees to convey a marketable title to the assets of the debtor railroad. That title having been conveyed to Mr. Findley, the Section 77 proceeding was terminated and the equity proceeding was resumed. Those who are cognizant of the ramifications of the instant case feel that the equity proceeding may truly be called the main course of litigation, and that the Section 77 proceeding was simply an intervening bankruptcy pro-

ceeding, at the conclusion of which the Court directed that the Trustees transfer all assets in their hands as Trustees to themselves as equity Receivers for the practical purpose of having distribution of all the assets made by the equity Receivers.

The petition for the allowance of compensation filed by Messrs. Buchanan and Sproul, in their capacities as Receivers as well as Trustees, sets forth in great detail the tremendous amount of work required of them in the performance of their duties as Receivers, a large portion of such work consisting of technical accounting duties which occupied many months of the time of the petitioners. Had outside professional accountants been employed to untangle the complicated financial records of the debtor company and its various subsidiaries, the fees of such accountants would probably have amounted to many thousands of dollars.

The financial difficulties of the railroad company which confronted the Receivers immediately upon their appointment required the exercise of skilled business judgment for their solution. These difficulties were effectively solved, first, by leasing the mining properties, then by obtaining permission for the abandonment of railroad operations, then by placing all shipments originating on the lines of the railroad upon a pre-payment basis, and finally by securing a purchaser for all the physical assets of the railroad and of its various subsidiary companies.

The Receivers were appointed to bring to an end a long drawn out receivership which had excited public criticism and condemnation, and they performed their duties so thoroughly and expeditiously that the affairs of the railroad and of the mining company and other affiliated companies were liquidated in orderly fashion within a period of less than two years following the date of their appointment.

Petitioners in their capacity as Receivers handled more than $1,600,000 as the proceeds of the sale of the various properties in their possession, including the physical assets of the railroad and of the Shawmut Mining Company, and, under their supervision, a vast number of disbursements were made in connection with the operation of the railroad and of the subsidiary companies. The tremendous extent and variety of these disbursements is shown in the First and Final Account of the Receivers of the railroad, which embraces 14 voluminous schedules. The First and Final Account of petitioners as Receivers of the Shawmut Mining Company embraces 22 separate schedules and fills a bulky volume. Both of these accounts relate strictly to the duties of the petitioners as Receivers, and show the wide scope and variety of the business operations conducted by petitioners solely as Receivers, without regard to the separate account filed by the petitioners as Trustees of the railroad.

There are no hard and rigid rules for determining the compensation of equity Receivers. The matter rests largely in the sound discretion of the Court. See Vol. II, Section 620, Tardy's Smith on Receivers (second edition). The same author in Section 621, cites the following from 34 Cyc. 472, which was quoted with approval by the Circuit Court of Appeals in the case of Eames v. H. B. Claflin Co., 2 Cir., 231 F. 693, 695, as illustrating the controlling factors to be considered by a court of equity in fixing the compensation of equity Receivers: "The considerations that should be controlling with the court in fixing compensation are the nature of the matters administered, the amount involved, the complications attending it, the amount of bond required, the time spent, the labor and skill needed or expended, the degree of success attained under all the circumstances, the fidelity to details, the appreciation evidenced as to the responsibilities of the position, the character of such responsibilities, the expedition with which the trust has been administered, in view of results reached, and the method, character, and promptness of the accounting, having regard, as a standard, to what is paid for somewhat similar services in the performance of official duties, not the standard in private business transactions. * * * The value of the services rendered should not be considered generally but only with reference to the trust administered."

Judged by all of the above considerations, the services of the Receivers entitle them

to substantial compensation. The Receivers performed a most difficult task with great thoroughness, and are to be commended for the skill and expedition with which they solved the exceedingly complicated problems of a receivership more than 40 years old. They accomplished in the space of two years what predecessor Receivers had not been able to accomplish in four decades.

■ Messrs. Buchanan and Sproul have requested the Court to award them the sum of $60,000 and $50,000, respectively, as compensation for their services both as Receivers and Trustees, exclusive of interim allowances of $18,000 which have previously been made to each of them for his services as Receiver.

The chief creditors of the receivership were represented at the hearing by counsel, and not one of these creditors objected to the allowance of the fees in the sums mentioned. Among the creditors so represented were the Erie Railroad, Pennsylvania Railroad, Pittsburg and Shawmut Railroad, and the Committee for the Protection of Certificate Holders. The Pittsburg and Shawmut Railroad alone owns $14,000,000 of debtor's bonds and $322,000 of Receiver's Certificates.

Lee W. Eckels, Esquire, an attorney for the Committee representing the holders of approximately $800,000 of Receiver's Certificates, stated to the Court: "As representing the Committee for the Protection of the Holders of Certificates of Indebtedness, we recommend the payment of the fees requested now by the Receivers and Trustees and their counsel."

I have previously indicated that I will award to Messrs. Buchanan and Sproul the sum of $7,330 each, for their services as Trustees. For his services as Receiver, I will award to Thomas C. Buchanan, Esquire, the sum of $52,670, which sum is in addition to the interim allowance of $18,000 which he has already received. To Robert C. Sproul, Jr., for his services as Receiver, I will award the sum of $42,670, which is in addition to the interim allowance of $18,000 which he has previously received. These sums are fair and reasonable, considering the responsibilities assumed by the Receivers, the skill and judgment with which they discharged these responsibilities, and the results achieved.

## IV. Compensation of Counsel for the Receivers and Trustees.

The petition of the Receivers and Trustees for the allowance of compensation, consisting of 58 legal cap pages containing 446 paragraphs, reveals at almost every page that the Receivers and Trustees were in constant touch with their counsel regarding the many complex legal problems which arose during the course of the receivership and of the trusteeship—problems ranging from freight embargoes to wage negotiations with unions, workmen's compensation matters, applications for loans to finance the operation of the railroad, the ability of the Receivers to convey a marketable title to the assets of the railroad divested of all liens, the priority of the claims of the various classes of creditors of the receivership, hearings in court on various applications and petitions by the Receivers or the Trustees, hearings before the Interstate Commerce Commission or conferences with officials of the Commission. It is apparent that the Receivers, and later the Trustees, required the constant advice of their counsel on an immense variety of legal problems.

The legal services rendered by counsel for the Receivers and for the Trustees are set forth in detail in the 56 page petition filed in Court by counsel, which petition contains 511 numbered paragraphs. The Court through many contacts is aware, and a casual reading of the petition for allowance confirms the conclusion that the course of the receivership and of the trusteeship was guided and directed in its broad phases as well as in its minute details by the advice and judgment of counsel. The matters referred to counsel by the Receivers and the Trustees were complex and technical legal problems, and these problems were solved by counsel with such skill and intelligence that the prompt and efficient liquidation of the assets of the receivership was made possible, while at the same time the rights of all parties in interest, including the general public, were preserved, as far as the exigencies of the situation permitted.

This receivership of The Pittsburg, Shawmut & Northern Railroad Company presented many legal problems that had never heretofore arisen in the course of railroad receiverships. Very few railroads in the course of this country's history have ever been abandoned outright because it was no longer financially feasible to continue to operate them at great losses. The situation that confronted counsel for the Receivers was not only the necessity of an abandonment of operations of an interstate railroad with approximately 200 miles of trackage in New York and Pennsylvania, but also the necessity of conveying a valid title to the purchasers of the railroad's assets.

To plan and carry through the many complicated legal devices set forth herein required legal skill of the highest order and special knowledge of the Acts of Congress relating to Bankruptcy. Such skill and knowledge was furnished to the Receivers and Trustees by their counsel and was an indispensable aid to the successful termination of the receivership and the orderly liquidation of all its assets. The skill, knowledge and advice of counsel was of inestimable aid to the Court.

Each of the counsel has already received an interim allowance of $5,000 for legal services rendered to the Receivers, and it is now suggested that in addition to such interim allowances, Bernard Goodman, Esquire, be granted an allowance of $50,000, and John T. Duff, Jr., Esquire, be granted an allowance of $40,000, as total compensation for their services to the Receivers and Trustees.

■ In view of the services rendered, the complexity of the legal problems handled, the responsibilities assumed by counsel in advising the Receivers and Trustees, and the successful termination of the receivership, and considering that the sale of the assets realized $1,505,000, I will award to Bernard Goodman, Esquire, an additional $45,000, and to John T. Duff, Jr., Esquire, an additional $35,000.

The Interstate Commerce Commission has not determined the maximum compensation allowable to counsel for their services in connection with the trusteeship. Of the additional $45,000 which I am awarding Mr. Goodman, the sum of $5,500 is awarded for his services to the trusteeship, and the remaining $39,500 for his services to the receivership. Of the additional $35,000 which I am awarding Mr. Duff, the sum of $5,500 is awarded for his services to the trusteeship, and the remaining $29,500 for his services to the receivership.

■ Adrian Block, Esquire, and Isador Setel, Esquire, attorneys in the City of Buffalo, New York, have rendered valuable legal services to Messrs. Buchanan and Sproul in the State of New York, particularly with respect to certain real estate of the debtor located within that state. For their counsel, I will award Mr. Block the sum of $3,000, and to Mr. Setel the sum of $1,750.

## V. Summary of the Services of the Receivers, Trustees and Counsel.

The receivership estate at the time of the appointment of the Receivers was such as would have warranted a summary liquidation thereof. On December 1, 1945, the cash on hand amounted to $21,000; current obligations exceeded $450,000; Receiver's Certificates totalling $2,100,000 had been in default since 1931; consequently, the estate was without any credit for working capital. Through their zeal, experience, business ability and attention to the task confronting them, the Receivers and Trustees accomplished the following major operations:

a. Succeeded in leasing the mines within two months after their appointment;

b. In March, 1946, they refused an offer for the railroad assets of $450,000, although the Receivers were under intense pressure from many interests to liquidate the estate at that time;

c. In this critical situation with no cash and with their efforts to secure working capital frustrated, coupled with indifference on the part of the holders of the Receiver's Certificates, they concluded that the railroad operation could not be continued without great losses due to the national coal and railroad strikes and the deteriorated condition of the railroad right of way and equipment, and, therefore, applied to the Court for immediate authority to curtail certain

operations and to apply to the Interstate Commerce Commission for abandonment of the railroad, which authority was given in May, 1946, and immediately acted upon by the Receivers;

d. In order to continue the railroad as a going concern and thereby secure to the creditors of all classes the full value of the railroad's assets (until abandonment was authorized by the Interstate Commerce Commission), the Receivers resorted to the expedient of placing all shipments originating on the lines of the railroad upon a prepaid basis. This afforded them a revolving fund, involuntarily contributed by the connecting railroads, which enabled the Receivers to continue its operations until a sale could be had of all its assets;

e. Through ingenuity and resourcefulness, and a well planned and managed sale, the much higher price of $1,505,000 was secured for all the joint assets in March, 1947, as compared with the value fixed by the offers in the Spring of 1946;

f. They devoted themselves to technical accounting duties, which were necessary to disentangle the complicated and incomplete accounting in the various companies within the receivership. In particular the preparation and filing of the account of the prior receivership was of primary importance. Had outside accountants been employed for these purposes, the costs involved would have amounted to thousands of dollars;

g. Claims of the present and prior receiverships have been collected through intensive effort and the moneys so collected, plus the fund realized from the sale of the assets, have been invested promptly to the best advantage of the estate. The whole administration of the estate has been businesslike and efficient, with complete consideration being given to the public interest involved in the successful liquidation within a year and a half of a 42 year old railroad receivership;

h. In connection with the foregoing, counsel for the Receivers and Trustees were of material assistance in the successful liquidation of this estate. Their excellent legal backgrounds and specialized knowledge of receivership and trusteeship matters assisted the Receivers and Trustees immeasurably in speedily, efficiently and effectively meeting the multitude of legal problems which arose in the course of the period of liquidation.

## VI. Time of Payment.

Although the bulk of the work in this proceeding has been performed, some of it in 1945, and the majority of it in 1946 and 1947, there still remain a few items of work to be completed, and a residue of details to be given attention. Accordingly, I will direct that 60 per cent of the sums awarded herein (exclusive of interim allowances previously made) be paid immediately, the distribution of the remaining 40 per cent to await the further order of the Court.

The petitioners herein will be allowed no additional awards of compensation, unless such awards may be justified by future rendition of services which are presently unforeseen, and which would entail an inordinate additional expenditure of time or effort.